IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| In re: Mt. Vernon Tenants Association, Inc. | : : |
| | : No. 962 C.D. 2022 |
| Application of Lowell L. Lundy | : |
| | : Submitted: July 5, 2024 |
| Appeal of: Mount Vernon Tenants Association, Inc. | : : |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE LORI A. DUMAS, Judge


OPINION
BY JUDGE McCULLOUGH                    FILED: August 9, 2024


Mount Vernon Tenants Association, Inc. (Association), a nonprofit housing association, appeals from the August 11, 2021 order of the Court of Common Pleas of Beaver County (trial court) granting Lowell L. Lundy's (Mr. Lundy) Application to Liquidate and Dissolve the Association and Appoint a Liquidating Receiver for the

Association (Application) under Section 5981 of the Nonprofit Corporation Law of 1988 (Law), 15 Pa. C.S. § 5981.[1] Upon careful review, we affirm.[2]

## I. Facts and Procedural History

The Association is a nonprofit housing association that was created by the filing of Articles of Incorporation on April 25, 1955. Its purpose was to purchase, operate, and manage a housing project on a nonprofit basis. (Supplemental Reproduced Record (S.R.R.) at 160b.) It is governed by an 8-member Board of Directors (Board), of which Mr. Lundy is a member. The Association's principal asset consists of a 7-acre property. It contains 10 buildings which contain 4 to 6 apartments each. The property has 50 apartments, a playground, and vacant land. *Id.* at 55a. The residential units are approximately 75 years old. *Id.*

---

[1] Section 5981 of Subchapter G of the Law, titled "Involuntary Liquidation and Dissolution," provides:

> **Proceedings upon application of member or director.** Upon application filed by a member or director of a nonprofit corporation the court may entertain proceedings for the involuntary winding up and dissolution of the corporation when any of the following occur:
>
> (1) the objects of the corporation have wholly failed, or are entirely abandoned, or their accomplishment is impracticable;
>
> (2) the acts of the directors, or those in control of the corporation, are illegal, oppressive or fraudulent and it is beneficial to the interests of the members that the corporation be wound up and dissolved;
>
> (3) the corporate assets are being misapplied or wasted and it is beneficial to the interests of the members that the corporation be wound up and dissolved.

15 Pa. C.S. § 5981.

[2] The Association mistakenly filed its appeal from the trial court's August 11, 2021 order in the Superior Court. This Court has exclusive jurisdiction of appeals from orders granting an application to liquidate and dissolve a nonprofit corporation. 42 Pa. C.S. § 762(a)(5). The Superior Court duly transferred the appeal to this Court by order issued July 29, 2022.

2

Mr. Lundy initiated this action in 2017, by filing an application seeking review of contested corporate action pursuant to Section 5793 of the Law, 15 Pa. C.S. § 5793.[3] Mr. Lundy alleged that the Association's books were not being audited annually in violation of the By-Laws. He argued that the Board's President and Treasurer should be ordered to comply with the By-Laws and to hire a certified public accountant to conduct an audit of the Association for the years 2014, 2015, and 2016. Pursuant to a court order, the Board was ordered to hire a certified public accountant to conduct the audit. Meanwhile, Mr. Lundy requested from the other Board members certain financial information pertaining to the repairs and maintenance of the property, Board minutes, bank records, and tax returns for 2015 through 2018. He was not provided with the records. On February 13, 2020, the parties entered into a Consent Order approved by the trial court. The Consent Order required the Association to provide Mr. Lundy with access to its business and financial records, and to hire a certified public accountant. The Consent Order specifically stated that if the Association did not comply with its terms, the trial court would entertain a petition to appoint a receiver to operate the Association.

---

[3] Section 5793(a)-(b) of the Law provides, in pertinent part:

> **(a) General rule.--**Upon application of any person aggrieved by any corporate action, the court may hear and determine the validity of the corporate action.
>
> **(b) Powers and procedures.**--By entering an appropriate order, the court may enforce the production of any books, papers and records of the corporation and other relevant evidence that may relate to the issue. The court shall provide for notice of the pendency of the proceedings under this section to all persons affected thereby. If it is determined that no valid corporate action has been taken, the court may order a meeting to be held in accordance with section 5792 (relating to proceedings prior to corporate action).

15 Pa. C.S. § 5793(a)-(b).

On October 15, 2020, Mr. Lundy filed the instant Application seeking to liquidate and dissolve the Association and appoint a liquidating receiver. Mr. Lundy alleged that

> D. The Board [] has failed and refused to implement and comply with the Orders of Court entered in these proceedings in the following respects:
>
> (1) The Board has failed and refused to provide Mr. Lundy with access to the financial records of [the] Association; and
>
> (2) The Board has failed to adopt the policies set forth in the Consent Order; it has not retained a certified public accountant to conduct annual audits and it has not requested a certified public accountant to provide a list of practices and procedures to be adopted in the operation of the corporation.
>
> E. In addition, [Mr. Lundy] believes, and therefore avers, that the Board has hired legal counsel to convert [the Association] from a nonprofit corporation to a limited liability company for the express purpose of denying [Mr. Lundy] his right to sit on the Board, which he has a right to do under the By-Laws of [the Association].[4]

(Reproduced Record (R.R.) at 148a-49a.)

On January 6, 2021, and January 19, 2021,[5] the trial court held evidentiary hearings on the Application. During the proceedings, the trial court heard testimony and received evidence concerning Mr. Lundy's access to the Association's financial records and the physical and fiscal wellbeing of the Association and the residential units.

---

[4] In support, Mr. Lundy attached as an exhibit to the Application a copy of an engagement letter dated August 11, 2020, from Attorney Wayne Cobb, the Association's counsel, to Nicole Singletary, the Board President, recommending to the Board that the Association be dissolved, and a new limited liability company created in its place. (R.R.at 172a-74a.)

[5] The transcript of the January 19, 2021 hearing is not part of the Reproduced Record or Supplemental Reproduced Record. It is part of the trial court's original record, and the Court has cited to it directly.

4

Mr. Lundy testified that he served on the Board since 2015. He said that over time, he had concerns with the way in which the Association was being operated and brought those to the attention of other Board members. (S.R.R. at 60b.) He was concerned that the Association had not filed any tax returns or had any audits performed. He testified that he asked the Board to dissolve the Association and appoint a receiver because he did not believe that the present Board had the ability to appropriately manage the property in its current condition. *Id.* at 70b. Specifically, he described that the electrical system was poor, the plumbing was poor, and the sidewalks and playground were in bad condition. *Id.* at 67a-68b. According to the audits that were performed per the trial court's orders, the repairs needed from 2014 to 2020 amounted to $300,000, but there was no documentation of what repairs had been done. *Id.* at 69b-70b. He stated that after the Consent Order was entered, he was given access to the Board's business records that were kept in the Association's business office, but the documents he sought were not there. *Id.* at 80b. For example, he could not locate any documents pertaining to the Association's bank accounts and mortgage. *Id.* at 82b-83b. He testified that he was uncertain whether the Association had the assets to address the issues that are failing on the property because the budget report did not reconcile with the balance sheet. *Id.* at 103b. Mr. Lundy further testified that at some point after he was engaged as counsel by the Association in August 2020, Attorney Cobb held a special Board meeting in his office, and Mr. Lundy participated over Zoom. When Mr. Lundy attempted to ask a question, Attorney Cobb told the other members of the Board that they could vote Mr. Lundy off the Board, and then "muted" Mr. Lundy, so no one could hear him speak for the remainder of the meeting. *Id.* at 67b-68b.

The Association called its office manager, Stacey Rice, who testified that she has worked in the position for approximately one year and four months. (Hearing Transcript, 1/19/21 (1/19/21 H.T.) at 33.) She said that Mr. Lundy came into the office

5

on October 2, 2020, and requested copies of the 2018, 2019, and 2020 audit reports and bank statements and those were provided to him. *Id.* at 34, 38.

Ms. Singletary, the Association's President, testified that she was elected president of the Board in August of 2020. *Id.* at 83. She testified that she made sure that every Board member was provided with a copy of the financial report at every monthly meeting. *Id.* at 84. She also made sure Board members have access to all documents that are kept in the office. *Id.* at 84-85. She acknowledged that the Association did not have general liability insurance, employment practice liability insurance, or directors' and officers' insurance until November 2020, which was a month after Mr. Lundy's Application was filed. *Id.* at 111-12. She acknowledged that sometime just prior to October 2020, State Farm refused to renew the Association's fire insurance policy because the plumbing was not updated and because there were two fires in a short period of time, one of which was caused by the electrical wiring. *Id.* at 113-15. She explained that due to the age of the buildings, the Association's greatest expense is the maintenance related to plumbing and electrical problems. *Id.* at 115, 119-20. She explained that the Board is constantly having discussions about how to address those needs. An open-ended mortgage on the Association's propert with First National Bank (FNB) is used for emergencies. *Id.* Ms. Singletary testified that since she became President, she called several emergency Board meetings due to plumbing issues. *Id.* at 116. She acknowledged that the funds in the Association's bank account had decreased by half in the past two months due to maintenance repairs. *Id.* at 126-27. She testified that she and the Board commissioned "Jim's Handyman Service, LLC" to perform an electrical inspection of the buildings, which identified "high priority" issues with all the buildings and recommended immediate changes. (S.R.R. at 27b-32b.) A copy of the inspection report was entered into evidence.

6

Ernest Williams testified that he had lived at the property for approximately 42 years and was the acting president of the Association from 2019-2020. He was the vice president for 3 years and a member of the Board for 17 years. (1/19/21, H.T. at 133.) He testified that there had been discussions by the Board to sell the property and they had received three offers of a million dollars or more. *Id.* at 137. He testified that the reason why the Board wanted to sell the property was because

> we've got mostly older members on our [B]oard, and the ones that voted to sell felt like that if we sold it that the property could be taken care of better than it was, because it's going down every year surely but slowly. So there was a time when they had 9, 10 members on the [B]oard and they took care of the property good. But as time drummed along, the [B]oard members got older, the [B]oard got lesser, and that's the reason we wanted to sell it.
> . . . .
> This is 2021 now, and every year the [B]oard members is getting older. The [B]oard members five years down the road ain't going to be able to run this, ain't going to be able to run [the Association], and I was concerned about that. Right now they're making it, but down the road I don't see, see, years ago they had people out there that can get on the [B]oard. Now, out there now, you've got mostly all old people, renters. Shareholders, they all old. And so five years down the road, who's going to be running [the Association]?

*Id.* at 138-39. He identified photographs of the property that he took a week prior, which showed significant repairs that needed to be done. *Id.* at 140-48. The photos depicted a hose running from the basements of one of the buildings that flooded and crumbling concrete sidewalks and stairs. He also testified that the cash on hand for the Association fluctuates from month to month from $15,000 to $40,000 and said that the Board took out a mortgage with FNB for $100,000 in 2017 as a reserve to take care of problems and emergencies because there was not always enough in the account to take care of

emergencies. *Id.* at 150-52. He believed that the property value was going down because it needs a lot of cement repairs and plumbing and electrical work, and the needs have not been taken care of. *Id.* at 160.

On January 19, 2021, the trial court ordered the parties to solicit proposals from potential entities or individuals who could serve as a receiver *pendente lite* for the purpose of reviewing and assessing the financial and physical condition of the Association and its property and give the court a report on the status. Based on the evidence presented, the trial court was concerned that the property is in a state of disrepair and, based on the financial concerns raised in the audits, may continue to diminish in value because there are not enough funds to make the necessary repairs. *Id.* at 172a, 174a-76a. **The Association's counsel, Mr. Cobb, agreed to provide the trial court with a potential receiver *pendente lite* and did not object to the trial court's reasons for appointing a receiver *pendente lite* or its proposed course of action. Upon agreement of all parties, the trial court scheduled a hearing for February 26, 2021, to examine the qualifications of the proposed receivers and determine which, if either, to appoint to give further evidence and direction to the trial court regarding the Application.**

On February 26, 2021, an evidentiary hearing was conducted at which the trial court heard testimony from potential receivers with respect to their ability to financially and physically evaluate the property and to determine if it could be sustained or should be sold and what they would charge the Association to make this evaluation.[6] The parties had the opportunity to question the potential receivers' qualifications and abilities to handle the matter.

Mr. Lundy presented the testimony of Randy Klingensmith of Premier Property Management Services. Mr. Klingensmith has been the leasing and business

---

[6] The transcript of the February 26, 2021 hearing is not part of the Reproduced Record or the Supplemental Reproduced Record. It is part of the trial court's original record and we have cited to it directly.

development manager of Premier since 2009. (H.T, 2/26/21 (2/26/21, H.T.) at 8.) He described Premier as a full-service property management company, which manages properties for private landlords and other entities. *Id.* He stated that Premier had acted as a receiver twice before. He would have to hire independent contractors to evaluate and provide estimates as to the deterioration of the buildings and sidewalks and the problems with the electrical, plumbing, and heating systems. *Id.* at 10.

The Association presented Jason Smida of Infinity Accounting and Business Consulting as the proposed receiver *pendente lite*. Mr. Smida is a certified public accountant. He had never acted in the capacity of a receiver before. He said he was contacted by the Association's counsel to review the current and projected financial transactions of the Association to determine if the cash flow would sustain the Association. *Id.* at 29. He testified that Premier could assess the Association's alleged financial instability and problems with the electrical and plumbing systems. To the extent that the receiver *pendente lite* appointment would require him to evaluate the physical condition of the property, he did not believe he was qualified to do so. In this regard, he explained that he did not believe he could be a receiver if it required him to assess the valuations of the actual repairs and maintenance needed. To clarify, he explained that, like Mr. Klingensmith, he would need to, and was willing to, contact outside individuals to assist with that. *Id.* at 30, 33, 38-39.

After the hearing, the trial court ordered both parties to submit a report stating how much it would cost to provide both a financial and physical assessment of the property. **Again, neither party objected to the appointment of a receiver *pendente lite* or the course of action proposed by the trial court. It is critical to note that at this time, the Association's counsel voiced no objection as to the trial court's focus on whether the property could be sustained under its current Board or that such inquiry was beyond the scope of the allegations of the Application.**

9

On April 12, 2021, the trial court appointed **the Association's proposed receiver**, Mr. Smida of Infinity, as the receiver *pendente lite* pursuant to Section 5984 of the Law, 15 Pa. C.S. § 5984.[7]  Infinity was directed to complete an assessment of the Association to assess its current financial situation for the purpose of improving the property and making it safe and habitable.  The trial court in the same order instructed Mr. Smida to contact independent contractors for the purpose of obtaining viable estimates of the needed repairs to sustain livability.  **Notably, no one objected to the appointment of a receiver *pendente lite* or the appointment of Smida/Infinity.**

On June 30, 2021, Infinity filed its report, drafted by Mr. Smida, with the trial court.  Mr. Smida performed a cash flow analysis of the Association and made an estimate of what the cash flow would be over the next five years.  Mr. Smida determined that the Association's cash flow for fiscal years 2022 through 2026 would be $265,286. (S.R.R. at 140b.)  Mr. Smida met with contractors and general contractors to identify the necessary repairs to the electrical systems, HVAC, plumbing, furnace, sidewalks, drainage, landscaping, painting, doors, windows, and siding.  Based on the estimates provided by the contractors, Mr. Smida opined that the cost of making the necessary improvements to the residential units would be $1,850,152.  *Id.* at 141b.  Mr. Smida estimated that the projected cash flow of the Association over the period of 2022 through 2026, with the improvements, would be negative $1,584,866.  *Id.* at 142b.  When taking into account certain funding and grants the Association represented it might receive, the

---

[7] Section 5984 of the Law provides:

> Upon the filing of an application under this subchapter, the court may issue injunctions, appoint a receiver *pendente lite* with such powers and duties as the court from time to time may direct and proceed as may be requisite to preserve the corporate assets wherever situated and carry on the business of the corporation until a full hearing can be had.

15 Pa. C.S. § 5984.

cash flow was reduced to negative $1,430,276. *Id.* at 143b. Based on these findings, Mr. Smida opined that the Association could not sustain its operations and make the necessary improvements to the residential units. *Id.* at 144b.

On August 10, 2021, the trial court held a hearing for the purpose of allowing the parties to question Mr. Smida as to his report and conclusions, and in essence whether a liquidating receiver should be appointed.[8] At the beginning of the hearing, the trial court asked the parties' counsel if they all agreed to Mr. Smida's qualifications to act as receiver *pendente lite* and all of them agreed:

> THE COURT: . . . just to incorporate into this record, before the receivers were appointed, I believe they testified at a previous hearing regarding their qualifications and abilities to handle this matter, and the parties were permitted to question him on that.
>
> **[Attorney Cobb]: Yes.**
>
> [Mr. William's Counsel]: I would.
>
> [Mr. Lundy's Counsel]: I would.
>
> THE COURT: Okay. So we're just going to bypass that and go right to the questions on this.

(H.T., 8/10/21 (8/10/21 H.T. at 8) (emphasis added).

Even though the Association recommended Mr. Smida to be the receiver *pendente lite*, Mr. Cobb extensively questioned him about his methodology and conclusions, but not on his qualifications. Mr. Smida explained that he obtained estimates from six contractors and relied on their expertise and professionalism. *Id.* at 26. He also checked with two clients with experience to verify that the estimates were reasonable. *Id.*

---

[8] Once again, the transcript of the August 10, 2021 hearing is not included in the Reproduced Record or Supplemental Reproduced Record; therefore, we have cited directly to it.

11

Mr. Smida testified that in his professional assessment, the buildings are old and need a lot of work and had not been maintained. *Id.* at 62. In his opinion, the property looked like a blighted property. At the end of the hearing, the trial court made its findings on the record.

> The [trial c]ourt heard significant testimony on January 6th and January [1]9th regarding the state and condition of the property. Of particular note, when I was reviewing information for today, for example, I looked at the testimony of Ernest Williams. Mr. Williams testified on, I believe, January 19 of 2021, and he testified that he had been the acting president of the association, and he had been a member of the [B]oard for 17 years, the vice president for three years and the acting president in 2019 and 2020. He indicated that there had been discussions by the [B]oard to sell the property, and [it] had received offers, three offers of a million dollars or more. He identified a number of photographs of the property that showed significant repairs that needed to be done. The photos depicted buildings that were not in good shape and needed repaired, holes in the property, and there was a photo of a hole at building six, and what was somewhat concerning to the [trial c]ourt was the fact that Mr. Williams testified that the cash on hand for the association fluctuates from month to month to [$]15[,000] to [$]40,000, and he often said that when the [B]oard took out an FNB mortgage in 2017, which I believe was for $100,000, it was taken out as a reserve to take care of problems and emergencies because there was not always enough in the account to take care of emergencies. There were plumbing problems every week and that type of problems, and those types of problems. He also, when cross-examined, indicated that it was intended what that $100,000 was taken out that the [A]ssociation intended to make repairs to windows and roofs in which there was some repairs made to roofs but not much. He indicated there was sidewalks that needed repaired, holes in buildings that needed fixed and some buildings that had oil heat that needed to be improved.

*Id.* at 75-76.

In the following excerpt, the trial court found Mr. Smida to be credible and accepted his opinions.

> One thing that was important to this [c]ourt is the fact that there's only so much a receiver can do to evaluate this. If he had done perhaps what Mr. Cobb had suggested, his fee for doing that would have been substantial. If he had gone out and retained, looked for 30 or 40 contractors and tried to pull them in to give assessments, gone through every single unit instead of paying in the neighborhood of 3 to $4,000, the [A]ssociation may have had to pay ten times or more that for purposes of this evaluation, which I was trying to avoid.
>
> Mr. Smida appeared to be a conscientious, neutral person who was trying to effectively evaluate this situation, and he did it from what I can understand to the best of his ability. He even noted that, if you look at the fact that there may be additional grants that are being received, this [A]ssociation is going to have to spend in excess of $1,500,000 to improve this property and make it habitable, and as a result, I believe, Mr. Lundy's [A]pplication has validity.

*Id.* at 79.

On August 11, 2021, the trial court entered its order granting Mr. Lundy's Application, in part, pursuant to Section 5981(3) of the Law, 15 Pa. C.S. § 5981(3). The trial court found that the evidence reflected that the objectives of the Association in maintaining and sustaining both the physical and financial viability of the entity and its property have failed in its ability to continue to maintain the same into the future is impracticable and that the corporate assets are being wasted. The trial court noted that there remains outstanding an issue with regard to how the liquidating receiver, once appointed, will distribute the assets/proceeds of the sale pursuant to 15 Pa. C.S. § 5985. The trial court set a date to complete discovery on the issue of the distribution of assets. It is from this order that the Association appeals.

13

## II.  Issues

On appeal, the Association challenges (1) the propriety of the appointment of the receiver *pendente lite*; and (2) the qualifications of the receiver appointed.

## III.  Analysis

The decision as to whether a receiver should be appointed or continued is within the sound discretion of the trial court. *Northampton National Bank of Easton v. Piscanio*, 379 A.2d 870, 873 (Pa. 1977); *Bogosian v. Foerder Tract Committee, Inc.*, 399 A.2d 408, 411 (Pa. Super. 1979).  In determining in a specific case whether the trial court has properly exercised its discretion in arriving at the decision whether or not to appoint and/or continue the appointment of a receiver, the appellate court must consider all of the facts and circumstances.  *Hankin v. Hankin*, 420 A.2d 1090, 1103 (Pa. Super. 1980) (citations omitted).  "Where substantial evidence supports findings that indicate that a receiver is necessary to preserve the property and the rights of all the parties concerned and to bring about the equitable distribution of the partnership assets by sale of those assets, the [trial court's] exercise of discretion must be affirmed." *Hankin v. Hankin*, 493 A.2d 675, 678 (Pa. 1985).

### A.

In its first issue, the Association argues that the trial court erred in ruling on issues that were beyond those that formed the basis of the Application.  It contends that the trial court's consideration was limited to the grounds stated in the Application and could not be based on additional facts developed during the hearing.  As stated, the grounds stated in the Application were that (1) the Board failed and refused to provide Mr. Lundy with access to the financial records of the Association in violation of the Consent Order; (2) the Board has failed to retain a certified public accountant to conduct annual audits in violation of the Consent Order; and (3) the Board was in the process of converting the Association from a nonprofit corporation to a limited liability company for

14

the express purpose of denying Mr. Lundy the right to sit on the Board. The Association argues that it presented sufficient evidence to demonstrate that all these allegations were untrue, and that Mr. Lundy presented no evidence to support the allegations set forth in the Application. Therefore, the Association contends, the trial court should have denied the Application rather than rely on evidence of the rundown condition of the property and possible lack of necessary funds to make the required repairs as the basis for requesting the parties to recommend candidates for a receiver *pendente lite*. We find several flaws with the Association's argument.

First, the Association's contention that Mr. Lundy did not offer evidence to support the allegations of the Application is not entirely accurate. He offered evidence that he and another member of the Board were **muted** during a Board meeting by the Association's counsel and that the other members were told that they could vote Mr. Lundy off the Board. The evidence further established that he was only given access to certain records he sought **after** he filed his Application. Mr. Lundy also presented an attorney engagement letter, which demonstrated that the Board, in fact, was contemplating changing the Association from a nonprofit entity to a limited liability company. (R.R. at 172a-74a.)

Second, the Association cites no authority for the proposition that the decision to appoint a receiver is strictly limited to the grounds stated in the Application and cannot be based on facts that develop during the hearing. Nor do we find such a position tenable. During the hearings, it became clear that the financial and physical wellbeing of the Association and its property was questionable. Witnesses on both sides expressed concerns as to whether the Board was able to sustain the Association given the deteriorating infrastructure and the cost of the repairs needed to make the buildings safe and habitable. At no time did the Association's counsel object to the testimony as being beyond the four corners of the Application. In fact, he fully participated in cross-

15

examining witnesses and eliciting evidence regarding the physical condition of the property. *See, e.g.*, S.R.R. at 45b-51b, 103b-04b. He also remained silent when, at the end of the presentation of evidence, opposing counsel argued that

> the purpose of the [A]ssociation has been frustrated in its ability to sustain. We've heard testimony of the disarray [] the property is in. It needs electrical work, plumbing, all sorts of other things. We heard testimony that this is a low housing, low-income housing unit, and it does not appear that [the Board] [had] the ability to make these repairs. [It has] taken out loans to make these repairs. And it[] just does not seem sustainable in its current position, so we would ask that [the] [A]pplication be granted and the property be sold.

(1/19/21 H.T. at 166-67.)

In general, a receiver may be appointed where the court is convinced that the right to appointment is free from doubt, where the potential loss resulting from the lack of a receivership would be irreparable, where there is no adequate remedy at law, and where the relief sought is necessary. *Bogosian*, 399 A.2d at 411. Hence, although a receiver will not be appointed unless it appears that the appointment is necessary to save the property from injury, threatened loss, or dissipation and although the appointment of a receiver is a drastic remedy, it should be imposed where it is necessary to effectuate equality and justice to all interests. *See McDougall v. Huntingdon & Broad Top Mountain Railroad & Coal Co.*, 143 A. 574, 578 (Pa. 1928). As we see it, the appointment of a receiver is a flexible process subject to the court's discretion. There is nothing to suggest that the trial court's decisions cannot adapt to the evolving circumstances of the case as they are revealed during hearings. *See, e.g.*, *Abrams v. Uchitel*, 806 A.2d 1, 8 (Pa. Super. 2002) (trial court could appoint receiver for purpose of preserving status quo during pendency of appeal from a transfer and coordination order, in litigation arising out of agreements between the parties to acquire and develop commercial real estate, even

16

though there was no specific request for such an appointment, where appellees had already petitioned for a receiver prior to the appeal based on allegations that partnership assets were being dissipated; appellees had no obligation to repeat the process, and the court was not required to suspend belief that dissipation of assets would continue while appeal was pending).[9]  Thus, we conclude that the trial court was not restricted to the grounds stated in the Application but was free to consider additional undisputed facts that emerged during the hearing to make a decision about appointing a receiver.  While the application to appoint a receiver for a nonprofit sets the initial stage, the trial court has the discretion to consider additional facts that may arise during the hearing.  This flexibility allows the court to adapt its decision based on the full context presented at the hearing, aiming to preserve the nonprofit's assets and address the issues effectively. *Hankin*, 493 A.2d at 677 ("receivers can be appointed to assure that assets will not be dissipated").

As the trial court explained at the conclusion of the August 10, 2021 hearing, it "heard significant evidence from a number of individuals on January 6th and January 19[th] of 2021, and that evidence raised serious questions regarding the state and condition of the property and its continued viability." (8/10/21 H.T. at 74.)  We discern no abuse of discretion by the trial court in reaching that determination.

Thirdly, and perhaps most importantly, we find that the Association is foreclosed from challenging the grounds upon which the appointment was made at this juncture.  Although the Association's counsel, Mr. Cobb, argued at the conclusion of the January 19, 2021 hearing that Mr. Lundy did not prove the allegations of his Application, he did not object to the trial court's receipt of evidence concerning the rundown condition of the property, or the costs it would take to repair.  Nor did he argue that the scope of the

---

[9] We may cite to Superior Court or non-precedential federal cases for their persuasive value. *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 653 n.20 (Pa. Cmwlth. 2021); *Regester v. Longwood Ambulance Co.*, 751 A.2d 694, 699 n.2 (Pa. Cmwlth. 2000).

17

hearing or evidence was beyond that which was raised in the Application. To the contrary, at every hearing, Mr. Cobb fully participated in the questioning and cross-examination of all witnesses regarding the state and condition of the property and its continued viability. The trial court on January 19, 2021, ordered counsel to solicit bids from individuals or firms to assess the physical and financial condition of the Association and its property. The Association did not object to the trial court's proposed course of action or its reasoning. In fact, the appointment of a receiver for the purpose of assessing the physical and financial condition of the Association and its property was made by common consent of all counsel. When the trial court asked for input from counsel on how a receiver would be paid and which entity would be most appropriate to assess both the financial and construction or maintenance aspect of the Association and its property, the Association's counsel offered the following:

> MR. COBB: Your Honor, I don't know how the organization will be able to pay for a receiver. I think that one piece of testimony that we do not have would be that of the certified public accountant who was operating in a position to understand the financials because they did do the audit, and you heard testimony that they're operating in a position to work with the QuickBooks with the manager, so I don't know. I think that's a question that we don't have an answer to, I don't have the answer to with regards to how a receiver would be paid.
>
> With regards to assessing both the financial and the construction component, I don't know of an organization that does that unless you're willing to expend a lot of money, and most of those are large consulting firms. So I think we would need two different organizations to assess the financial and the construction on that.

(1/19/21 H.T. at 174.) The Association's counsel then, fully and without objection, cooperated and participated in the search and recommendation of a qualified candidate to act as receiver *pendente lite*, ultimately recommending Mr. Smida for the job. The

18

Association had every opportunity to object at that time to the appointment of a receiver based on grounds that the basis exceeded the scope of the Application. However, he did not do so. The law is well established that

> [w]hile a party has a duty to preserve an issue at every stage of a proceeding, he or she also **must comply with the general rule to raise an issue at the earliest opportunity**. *Renna v. Dep*[*artment*] *of Transp*[*ortation*]*, Bureau of Driver Licensing*, 762 A.2d 785, 788 (Pa. Cmwlth. 2000) (holding failure to raise issue during trial court's hearing constituted waiver).

*In Re Petition to Set Aside Upset Tax Sale*, 218 A.3d 995, 998 (Pa. Cmwlth. 2019) (emphasis added). The Pennsylvania Supreme Court has explained:

> Requiring a litigant to make a timely, specific objection during trial ensures that the trial court has a chance to correct alleged trial errors. *Dilliplaine v. Lehigh Valley Tr*[*ust*] *Co.*, . . . 322 A.2d 114, 116 ([Pa.] 1974). We have stressed that "[w]aiver is indispensable to the orderly functioning of our judicial process and developed out of a sense of fairness to an opposing party and as a means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party has failed to preserve." *Reilly v. Southeastern Pennsylvania Transp*[*ortation*] *Auth*[*ority*], 489 A.2d [1291,] 1300 [(Pa. 1985)].

*Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1124-25 (Pa. 2000). Accordingly, "[o]n appeal[,] the [appellate c]ourt will not consider a claim that was not called to the trial court's attention at a time when any error committed could have been corrected." *Campbell v. Department of Transportation, Bureau of Driver Licensing*, 86 A.3d 344, 349, 349 n.3 (Pa. Cmwlth. 2014) (quoting *Thompson v. Thompson*, 963 A.2d 474, 475-76 (Pa. Super. 2008)).

In *In re Self-Drive-It Corporation*, 134 A.2d 662 (Pa. 1957), our Supreme Court rejected a similar attempt by stockholders (appellants) to challenge the appointment of a liquidating receiver where their counsel acquiesced and consented to the appointment

of a liquidating receiver. The trial court appointed two temporary co-receivers and ordered them to file an inventory and appraisement of the assets and property of the corporation and to make a report to the court thereon within 30 days. Pursuant to this order, an exhaustive and comprehensive report was filed in which the temporary co-receivers reviewed the nature, history, and problems of the business and concluded with the recommendation, buttressed with full reasons therefor, that a liquidating receiver should be appointed whose primary duty should be to liquidate the corporate assets. *Id.* at 664. A hearing was held to determine if a permanent receiver should be appointed. Uncontradicted evidence was presented that there was a deadlock in the management of the corporation and that the corporation was suffering irreparable injury. At the hearing, the appellants' counsel consented to the appointment of a liquidating receiver. At no time during the proceedings did the appellants offer any objection whatsoever to what was being said or done. *Id.* at 665. Thereafter, the liquidating receiver petitioned for leave to sell the corporate assets. The trial court ordered the liquidating receiver to sell the corporate assets to the highest bidder. The appellants filed a motion to quash, dismiss and set aside the proceedings which was denied by the trial court. The appellants appealed, arguing, *inter alia*, that there was insufficient evidence to support the finding that there was a deadlock in the management and that the court erred when it appointed a receiver. *Id.* at 666. The Supreme Court declined to address the merits of either argument, explaining:

> We deem it wholly unnecessary to consider the merits of the appellants' first two assumptions in view of the fact that they, as has been explained, expressly consented to the appointment of the liquidating receiver. Having once given such consent in open court, **thereby foreclosing the need for any further testimony to show the deadlock and irreparable injury**, [the] **appellants will not now be heard to deny the necessity for the receivers' appointment**. Nor can [the] appellants be heard to assert that they were denied due process of law when, in a

20

hearing held for the express purpose of affording due process, they consented to the appointment of the receiver and thus, impliedly if not expressly, admitted the necessity for such an appointment. . . . **The appellants, by their consent and acquiescence to the appointment of the receiver, induced the court below to take the action of which they now complain and should be foreclosed from complaining about the order of the court**.

*Id.* (emphasis added).

As in *Self-Drive-It Corporation*, the Association's counsel consented to the appointment of a receiver *pendente lite*, and even provided the trial court with a proposed firm/individual whom he represented to the trial court would be suitable for the task. Therefore, the Association cannot now be heard to complain that the trial court erred by appointing a receiver based on the evidence presented at the two hearings where the trial court relied on that acquiescence. *See also In re Huffman's Estate*, 36 A.2d 639, 640 (Pa. 1944) (holding that counsel, having agreed to the adoption of audit procedure and fully participated in it, could not claim on appeal that the pleadings were not proper to receive such proof); *Grocery & Food Warehousemen Local Union No. 635 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, A. F. of L. v. Kroger Co.*, 70 A.2d 218, 219 (Pa. 1950) (counsel for the petitioner competently agreed to the adoption of a legally permissible and expeditious mode of procedure, wherein he fully participated, and he will not be heard to complain, after the court's entry of a final order, that other procedure was not followed).

Accordingly, for these reasons, we find the Association's first issue to be without merit.

## B.

Next, the Association argues that the trial court erred and abused its discretion in choosing Mr. Smida, as the receiver *pendente lite* who opined that the cost

of repairs exceeded the amount of cash flow by $1.5 million. The Association alleges that

> [t]he [trial c]ourt ultimately erred by choosing an individual to serve as a receiver who is unqualified. The [trial c]ourt received a proposal from two parties. The one party was an experienced property manager which had been previously appointed as a Receiver and whose organization was serving as a Receiver on a property in a separate matter at the time the [trial c]ourt was determining who should be a receiver. The second party which was ultimately selected as a receiver expressly stated that it did not want to be appointed as a Receiver; [it] had no experience with what was requested by the Court and was not at all familiar with the property development; management or even choosing whether a property was sustainable.

(Association's Br. at 12.)

It is in the discretion of the trial court to choose the receiver, appoint the receiver to oversee the corporation, and then rely on the opinions of such receiver. *Serota on behalf of London Towne Homeowners Association v. Mager*, 304 A.3d 828 (Pa. Cmwlth. 2023). As our courts have stated, such a decision is reviewed under the abuse of discretion standard. *Franklin National Bank v. Kennerly Coal & Coke Co.*, 150 A. 902, 903 (Pa. 1930). An abuse can be found if the trial court misapplied the law, if the trial court exercised its judgment unreasonably, if the trial court showed any partiality or prejudice, or when there was insufficient evidence in the record to support the ruling of the court. *Flenke v. Huntington*, 111 A.3d 1197 (Pa. Super. 2015); *A.D. v. M.A.B.*, 989 A.2d 32 (Pa. Super. 2010). We find no such abuse of discretion here.

Initially, we must note that we find it disconcerting, and somewhat disingenuous, that the Association skirts the fact that the "the second party which was ultimately selected as a receiver" and of whom it now complains, was the Association's own witness. To state the obvious, the Association has done a 180-degree turn in terms of Mr. Smida's competency. Mr. Smida was the Association's recommendation for

22

receiver *pendente lite*. Unsatisfied with the unfavorable result of Mr. Smida's evaluation and recommendation, the Association now seeks to discredit him as unqualified. We reject its belated attempt to do so.

On February 26, 2021, the trial court heard testimony from two potential receivers. The trial court questioned them both at length about their qualifications and gave all counsel an opportunity to do so.[10]

On August 10, 2021, in open court, the Association's counsel, Mr. Cobb, along with opposing counsel, expressed their agreement that Mr. Smida was qualified to act as receiver *pendente lite*. The trial court then specifically, in reliance on that representation, bypassed *voir dire* on his qualifications. If the Association believed that its witness, Mr. Smida, was unqualified to give his opinions, it either: (1) should not have recommended him; or (2) objected to Mr. Smida's qualifications before he gave his substantive testimony. The time to have the matter explored was on August 10, 2021, not now. *See Wheeler v. Workers' Compensation Appeal Board (Reading Hospital and Medical Center)*, 829 A.2d 730 (Pa. Cmwlth. 2003) (claimant waived objections to expert's qualifications where his attorney stated at the deposition that he had no objections to the expert's qualifications to testify as a vocational expert).

As to the Association's challenge to Mr. Smida's methodologies, the Association argues that Mr. Smida did not hire proper inspectors and only inspected one

---

[10] The Association states that Mr. Smida "stated that [he] did not want to be appointed as a [r]eceiver" and that "he readily admitted he did not have the qualifications to complete the assignment." (Association's Br. at 12, 25, 27.) This is a gross misrepresentation of Mr. Smida's testimony and what transpired before the trial court. On February 26, 2021, when the trial court was questioning the potential receivers, Mr. Smida initially expressed concern that he had no experience in determining what improvements needed to be made or what each would cost. After some discussion, it was agreed and understood that whoever was appointed would have to locate and rely upon outside contractors to supply him with that information and provide estimates of the costs of making those improvements. (2/26/21 H.T. at 33-34.) After that clarification, Mr. Smida indicated his desire to submit a proposal that included the costs associated with the retention of the independent contractors to do the physical analysis and assessment. *Id.* at 59.

of the units rather than all or most of them. It maintains that Mr. Smida based his opinions upon his "own personal preference for living in such housing." (Association's Br. at 26.)

Our trial courts, sitting in equity, are vested with wide discretion when determining whether a receiver is required. *Hankin*, 493 A.2d at 677. Since the trial court hears the evidence and evaluates its credibility, its factual findings must be accorded great weight by appellate tribunals and rarely disturbed. *Id.* Where substantial evidence supports findings that indicate that a receiver is necessary to preserve the property and the rights of all the parties concerned and to bring about the equitable distribution of the partnership assets by sale of those assets, the trial court's exercise of discretion must be affirmed. *Id.*

Here, the trial court found Mr. Smida appeared to be "a conscientious, neutral person who was trying to effectively evaluate this situation, and he did it . . . to the best of his ability." (8/10/21 H.T. at 79.) The trial court accepted Mr. Smida's opinion that the Association will have to spend "in excess of $1,500,000 to improve this property and make it habitable," and, as a result, it found that Mr. Lundy's Application "had validity." *Id.*

We have carefully reviewed the extensive record and Mr. Smida's report. The record reveals that Mr. Smida based his opinions on the estimates that he received for the scope of work that was able to be determined by the contractors, general contractors, and subcontractors that were able to walk through the property and conduct their assessments. (S.R.R. at 137b.) It was within the trial court's discretion to credit and accept the opinions of Mr. Smida. Our review of that decision, considering all the facts and circumstances, reveals no abuse of discretion.

Accordingly, we affirm the trial court.

_____
PATRICIA A. McCULLOUGH, Judge

24

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Mt. Vernon Tenants        :
Association, Inc.                 :
                                :   No. 962 C.D. 2022
Application of Lowell L. Lundy    :
                                :
Appeal of Mount Vernon Tenants  :
Association, Inc.                 :

## *<u>ORDER</u>*

AND NOW, this 9th day of August, 2024, the August 11, 2021 order of the Court of Common Pleas of Beaver County is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge